CARLEEN JOHNSON et al., Plaintiffs-Appellees, v. BELLEVILLE RADIOLOGISTS, LTD., et al., Defendants-Appellants (St. Elizabeth's Hospital et al., Defendants).

Fifth District   No. 5—90—0313

Opinion filed October 23, 1991.

Peter von Gontard and Jan E. Dodd, both of Sandberg, Phoenix & von Gontard, P.C., of St. Louis, Missouri, for appellants.

Philip C. Denton, of Hullverson Law Firm, of St. Louis, Missouri, for appellees.

JUSTICE CHAPMAN delivered the opinion of the court:

Plaintiffs brought this action for medical malpractice and claimed Carleen was rendered infertile because two surgical sponges were left in her abdomen following a caesarean delivery. Her husband, Mark Johnson, brought a claim for loss of consortium. Plaintiffs' claim against Dr. Fred Mueller was dismissed before trial, and his role in this cause is not involved in this appeal.

The case was called for jury trial in December 1989. After *voir dire* and prior to opening statements, plaintiffs announced that they had reached a settlement agreement with St. Elizabeth's Hospital and Dr. Stephen Mueller. A hearing was immediately conducted to obtain court approval of the settlement. During the hearing it was disclosed that the proposed settlement called for each of the settling defendants to pay $170,000 and to be dismissed with prejudice. The total settlement of $340,000 was then apportioned by the plaintiffs' attorney at $40,000 for Carleen Johnson's injuries and $300,000 for Mark Johnson's loss of consortium. The settling defendants took no part in the allocation.

Dr. Lehnert and Belleville Radiologists, Ltd. (Belleville Radiologists), objected to the apportionment of the settlement and argued that it was contrived to circumvent section 2(c) of the Contribution Among Joint Tortfeasor's Act (Contribution Act) (Ill. Rev. Stat. 1989, ch. 70, par. 302(c)), which provides:

> "When a release or covenant not to sue or not to enforce judgment is given in good faith to one or more persons liable in tort arising out of the same injury *** it reduces the recovery on any claim against the others to the extent of any amount stated in the release or the covenant, or in the amount of the consideration actually paid for it, whichever is greater." (Ill. Rev. Stat. 1989, ch. 70, par. 302(c).)

Lehnert and Belleville Radiologists argued that the apportionment would effectively avoid any meaningful setoff anticipated from a jury

verdict favoring the plaintiffs. After the hearing the trial court found the amount of settlement was made in good faith and reserved any ruling on the apportionment. The jury ultimately awarded Carleen Johnson $529,600, and Mark Johnson $50,000.

Defendants Lehnert and Belleville Radiologists filed a post-trial motion seeking a setoff of the entire $340,000 from the verdict of $579,600. In the alternative, defendants requested that the trial court reallocate the settlement proceeds to fairly preserve the defendants' right of setoff. The trial court denied Lehnert's and Belleville Radiologists' motions. Their appeal raises three issues: (1) whether the trial court applied the proper standard in approving the settlement allocation; (2) whether the settlement setoff, which is allegedly disproportionate to the jury award, is fair and reasonable; and (3) whether Lehnert and Belleville Radiologists have a right to set off the entire settlement proceeds against the judgment. We believe the three questions presented can be consolidated into two basic issues: (1) whether the settlement, including the allocation, was in good faith pursuant to section 2(c) of the Contribution Act, and (2) whether the entire amount of the settlement should be used as a setoff against the judgment. We affirm.

Illinois public policy favors the peaceful and voluntary resolution of disputes through settlement agreements; any claim that such an agreement is not valid must be proved by clear and convincing evidence. (*McKanna v. Duo-Fast Corp.* (1987), 161 Ill. App. 3d 518, 525, 515 N.E.2d 157, 162.) Once the settling parties represent to the court that they have reached a good-faith settlement and present its terms to the court, a presumption of validity arises and the burden of proof on the issue of good-faith shifts to the party challenging the good-faith nature of the settlement. (*Pritchard v. Swedish American Hospital* (1990), 199 Ill. App. 3d 990, 996-97, 557 N.E.2d 988, 992.) The Contribution Act does not define a good-faith settlement. The circuit court is authorized to determine the good faith of a settlement in a variety of ways: solely upon the arguments of counsel (*McKanna*, 161 Ill. App. 3d at 526, 515 N.E.2d at 163); or on the basis of affidavits, depositions, and other discovery materials of record (*Melzer v. Bausch & Lomb, Inc.* (1989), 193 Ill. App. 3d 59, 62, 549 N.E.2d 817, 820); or after conducting an evidentiary hearing (see *Lorenz v. Air Illinois, Inc.* (1988), 168 Ill. App. 3d 1060, 522 N.E.2d 1352). In assessing good faith, the court must consider all of the circumstances surrounding the settlement. *Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107, 122, 499 N.E.2d 1373, 1380; *Snoddy v. Teepak, Inc.* (1990), 198 Ill. App. 3d 966, 969, 556 N.E.2d 682, 684.

Lehnert and Belleville Radiologists point out that the jury returned a verdict 10 times greater for the wife's claim than for the husband's consortium claim, while the settlement allocated nine times more to the husband's claim than to the wife's. Defendants argue that there is no basis in the record to support the greater allocation to the consortium claim. Defendants claim that their objection to the apportionment is not based on hindsight following the return of the verdict, but rather on common sense. They submit that a settlement apportionment should not be out of line with the sums which the injured party and spouse would foreseeably recover by way of judgment. They urge this court to find that this settlement apportionment is unsupported by the record and is, therefore, erroneous.

In testing a pretrial settlement for good faith, the Illinois courts have rejected the "ratio test," which compares the amounts of settlements with verdicts ultimately returned (*Doellman v. Warner & Swasey Co.* (1986), 147 Ill. App. 3d 842, 849, 498 N.E.2d 690, 696; *Ballweg v. City of Springfield* (1984), 130 Ill. App. 3d 241, 473 N.E.2d 342, *aff'd in part, rev'd in part* (1986), 114 Ill. 2d 107, 499 N.E.2d 1373; *Lowe v. Norfolk & Western Ry. Co.* (1984), 124 Ill. App. 3d 80, 463 N.E.2d 792), and treat it as only one factor in determining good faith because damage awards are often difficult to predict. (*O'Connor v. Pinto Trucking Service, Inc.* (1986), 149 Ill. App. 3d 911, 501 N.E.2d 263; *Perez v. Espinoza* (1985), 137 Ill. App. 3d 762, 484 N.E.2d 1232.) We find the reasoning adopted in those cases testing good faith applicable to the issue at bar. Just as " '[i]t is virtually impossible to use an unknown factor; *i.e.*, the jury's verdict, to test good faith prior to trial' " (*Doellman*, 147 Ill. App. 3d at 849, 498 N.E.2d at 696, quoting *Lowe*, 124 Ill. App. 3d at 94, 463 N.E.2d at 803), it is naive to suggest that the trial court has the ability to delve into the minds of the jurors and determine whether the settlement apportionment is in accord with the sums the jury would foreseeably award. Apportionment of a total settlement amount is nothing more than an assignment of a predicted value for more than one claimant's case to each of those claimants. The amount of a settlement might legitimately be far different from a damage award which results from full litigation. *Snoddy*, 198 Ill. App. 3d at 970, 556 N.E.2d at 685.

■ In this case the circuit court's order confirms that the court did indeed take into consideration the probable verdict and the possibility of an unexpected result:

"Considering all the unique circumstances at the time the case was settled—without the benefit of the foresight [*sic*] of the actual jury verdict—the Court finds that the Defendants were

clearly open to a very large verdict in favor of Mark Johnson since his consortium loss could be considered equivalent to his wife's loss of fertility. On the other hand, given the uncontroverted evidence that Carleen would not have become infertile had Dr. Lehnert reported the obvious presence of the surgical sponges in his X-ray report, the jury may have limited Dr. Mueller's and St. Elizabeth Hospital's responsibility for damages to no more than those related to a prompt second surgery to remove the sponges. Hence, a small payment by Dr. Mueller and the hospital to Carleen to cover bills, lost wages and some slight disfigurement can be soundly justified."

Settlement was reached prior to trial when the amount of plaintiffs' recovery was uncertain. Based on the foregoing, we cannot find that the circuit court erred in concluding that the settlement amount and apportionment were in good faith.

Defendants argue that the circuit court applied an improper standard in determining the validity of the settlement. Our attention is drawn to the circuit court's order wherein it states:

"Dr. Lehnert[ ]at no time before judgment sought leave to file a contribution claim. As a result of his election not to file a contribution claim, Dr. Lehnert concedes that his claim for contribution is barred under the holding of the Illinois Supreme Court in *Laue v. Leifheit*, 105 Ill. 2d 191, 473 N.E.2d 939 (1985).

In this context, the Court finds that Dr. Lehnert has waived his objection that the settlement was not given in good faith. This conclusion is supported by Dr. Lehnert's counsel's comment on the record * * *

'So I don't quarrel with those settling Defendants' opportunities to each offer $170,000 to be free from the litigation except to the extent that it is used ... fraudulently or at least in bad faith to try to defeat a valid and appropriate setoff in the full amount of the settlement, which is $340,000 and not $40,000.' * * *

This statement does not object to the good faith aspect of the settlement, but rather requests the court to interpret the settlement in a manner not intended or acquiesced in by the settling parties.

* * *

* * * [A]ll parties agreed to or ratified the apportionment between Mark and Carleen * * *."

Defendants contend that it is clear that the circuit court premised its findings on the conclusion that failure to file a claim for contribution waives a party's ability to contest the good-faith nature of the settlement. Defendants argue that the court's conclusion is erroneous. They also maintain that even if such a conclusion were not improper, the circuit court should have assessed whether the settlement allocation impaired the rights of the nonsettling parties.

■ The trial court was mistaken in its conclusion that the defendants' failure to file a contribution claim constituted a waiver of their position. The provision for a setoff contained in the Contribution Act is not the source of the defendants' right to a setoff; it is merely a codification of that right. Defendants were entitled to a setoff at common law. (*New York, Chicago & St. Louis R.R. Co. v. American Transit Lines, Inc.* (1951), 408 Ill. 336, 97 N.E.2d 264.) Defendants objected to the settlement allocation immediately upon learning of the settlement. Therefore, the trial court's reliance on the defendants' failure to file a contribution counterclaim as indicative of waiver was improper.

In another part of its order the trial court went on to state that even though it need not decide the issue of the appropriateness of the allocation, because of the defendants' waiver, it had in fact already done so in an earlier ruling and reaffirmed that position. Immediately following this statement, the trial court states that all parties had agreed to or ratified the settlement. This latter statement is incorrect; the defendants clearly objected at the first revelation of the settlement and continued to maintain their position that the allocation was inappropriate throughout the remainder of the proceedings. Therefore, defendants have not waived their position. However, even though the trial court mistakenly thought there was a waiver either because of defendants' failure to file a counterclaim or because of counsel's statement, it nevertheless did consider and rule upon the appropriateness of the allocation.

The defendants contend that the allocation was no more than a manipulation by the plaintiffs which enabled them to make a double recovery, to obtain more than the jury actually intended them to receive.

The jury awarded Carleen $529,600 and Mark $50,000 for a total of $579,600. Lehnert and Belleville Radiologists are required to pay that portion of the jury verdict not covered by the settlement. Defendants argue that the pretrial settlement allocation denied them any meaningful setoff because $250,000 of Mark's settlement proceeds were not available as a setoff since the jury only awarded him

$50,000. In addition, only the $40,000 allocated to Carleen was available as a setoff against her $529,600 verdict. They contend that because of the ill-apportioned settlement, plaintiffs' total recovery is increased by $250,000. To illustrate, if the total verdict of $579,600 was reduced by the total settlement of $340,000, Lehnert and Belleville Radiologists' liability would be $239,600. However, if the wife's verdict of $529,600 was reduced only by her apportioned settlement of $40,000, Lehnert and Belleville Radiologists' liability would be $489,600. No amount would be due from defendants with regard to the husband because his $50,000 verdict was satisfied by the settlement.

Defendants rely upon *Page v. Hibbard* (1987), 119 Ill. 2d 41, 518 N.E.2d 69, and *Blagg v. Illinois F.W.D. Truck & Equipment Co.* (1991), 143 Ill. 2d 188, 572 N.E.2d 920, to support their contention that allocation of a settlement involving consortium claims should be closely scrutinized to prevent the injustice which they claim occurred in this case. They contend that an allocation which results in reduction of the setoff potential to the remaining defendants prevents the settlement from being in good faith.

■ We must reject this contention. In a multiparty case there are many factors to be considered in effecting a settlement agreement. The first and most obvious consideration is the total amount of money involved. Each plaintiff is interested in obtaining the greatest amount of money for his or her claim, and each defendant is desirous of contributing the smallest amount toward the settlement. With this overall concept in mind the differences between the sides and among the parties on either side can multiply rapidly.

There may be a significant disparity between the value plaintiffs place on their loss and the value the defendants place on that same loss. There may be a dispute as to just what the loss is: is the injury permanent; if not, how far into the future is it likely to persist? There may be disputes among the individual plaintiffs as to the value of their respective claims and among individual defendants as to the extent of their relative culpabilities. The extent to which any party is risk averse or risk prone will also effect its desire to settle the case or to gamble on the result of a trial.

These are only a few of the broad factors that are taken into consideration in the settlement of a case. Subsumed within them are the relative abilities of counsel, the appearance and potential jury appeal of the parties, pending evidentiary and other legal issues, the makeup of the jury, and the parties' perception of the attitude of the court toward the type of the case involved. Superimposed upon all of this are

the dynamics of the settlement process itself. Someone has to begin it; generally, it is the plaintiff who opens with a demand to which some response in the way of an offer is made. At this point matters can become more complicated. Multiple plaintiffs may have given a single joint demand or they may have submitted individual demands. Multiple defendants may have made their offer individually or as a single joint response. Individual defendants may have made their offers dependent upon any of several conditions: an offer may be contingent upon the entire case being settled; an offer of "X" dollars may be made, but only if each of the other defendants also pays "X" dollars or some percentage of that amount; an offer may be contingent upon a court finding of a good-faith settlement under the Contribution Act so that they will not be subjected to continued litigation and/or risk after the settlement.

Since settlement with any defendant provides the remaining defendants with a setoff of the settlement amount, there is a certain temptation for each defendant to be recalcitrant.

The situation that can occur during settlement negotiations is similar to the one described by economists as the "free rider problem." (C. Goetz, Law & Economics 24-29 (1984).) If we assume there is a private bridge that leads to four houses and requires maintenance of $400 per year, we might conclude that a fair distribution of that maintenance fee would be for each of the home owners, A through D, to voluntarily pay $100 toward the maintenance of the bridge. The problem is that the bridge *must* have the $400 in maintenance each year or none of the home owners can safely use it. Therefore, if Mr. "A" wants to cross his bridge in peace following a hard day's work (and if he is more of a risk averter than B, C, or D), he may be willing to pay more than his $100 share. Once any of the homeowners pays more than $100, each of the remaining homeowners' responsibility is reduced. It is, therefore, perfectly logical for each of them to look to the others to pay first and to hope that any or all of the first payors will reduce their eventual payment. Under these circumstances, recalcitrance rewards.

We do not mean to imply any connotation of moral, legal, or ethical disapprobation by the use of the words temptation and recalcitrant. We are not critical of any counsel in litigation who advises his client, "I think our chances of winning the case are 50/50. I estimate the verdict range at $200-400,000, let's say it's $300,000. Therefore, I estimate our own potential risk at 50% of $300,000, or $150,000. If the other three defendants' offer of $50,000 each is accepted, we would be entitled to a setoff of $150,000 which is what our theoretical

exposure is, *i.e.*, the plaintiff has to get a verdict against us of over $150,000 before we pay anything. Therefore, my advice is offer nothing, try the case." This is perfectly sound and logical legal advice, and if it is given and followed in every multiparty case, very few of such cases will ever be completely settled. Given that the settlement of cases is one of the goals of the Contribution Act (*Rakowski v. Lucente* (1984), 104 Ill. 2d 317, 325, 472 N.E.2d 791, 795), the question which arises is how the plaintiffs and the defendants who are willing to settle deal with recalcitrant defendants.

There are several ways. First, the use of a loan agreement. While the loan agreement has been characterized as a device created to ameliorate the harsh results of the no-contribution rule (*Henry v. St. John's Hospital* (1990), 138 Ill. 2d 533, 563 N.E.2d 410), it also has the distinct, practical advantage of depriving recalcitrant defendants of the benefit of a setoff. A second tool is the Contribution Act itself, which allows settling defendants to pay the entire claim, obtain the remaining defendants' names on the release, and then pursue the remaining defendant for the amount they feel they have paid in excess of their culpability. Another way that is not available in all cases is the allocation of settlement proceeds among plaintiffs in a way that is intended to put pressure to settle on the remaining defendant.

We note that the record in this case does not reflect that the plaintiffs allocated the settlement proceeds solely to pressure the defendants into settling. In fact plaintiffs deny any such motivation. Plaintiffs' counsel argues that: (1) he felt that Mark's claim was almost as substantial as Carleen's because he too had been deprived of the ability to have additional children, and (2) even though in counsel's estimation the claims came close to having the same value, he was concerned that the jury might not view them in the same way. If the jury viewed Carleen's claim as the more significant injury, then Mark could be undercompensated. Plaintiffs' counsel contends that he allocated more of the settlement proceeds to Mark to overcome the potential jury bias in Carleen's favor. We have engaged in the somewhat lengthy discussion on allocation as a method of pressuring remaining defendants not because we are unaware of plaintiffs' counsel's denial of the use of the method, but because we think it should be made clear that, even if plaintiffs had pressure application as a motive of the allocation, that motivation alone does not necessarily establish bad faith on the part of the plaintiffs and the settling defendants. Manipulation of an allocation can be evidence of bad faith in a settlement negotiation, but it is not *per se* bad faith to engage in such a manipulation. In other words, the policy of effectuating settlements

that is one of the policies of the Contribution Act can be achieved by allocations such as the one involved in this case. Therefore, an allocation made by that process may be in good faith.

Both parties cite the case of *Blagg v. Illinois F.W.D. Truck & Equipment Co.* (1989), 186 Ill. App. 3d 955, 542 N.E.2d 1294, which denied good-faith status to a settlement. Since the instant appeal was argued that decision has been affirmed by the supreme court. (*Blagg*, 143 Ill. 2d 188, 572 N.E.2d 920.) The settlement at issue in *Blagg* concerned the allocation of recovery for loss of consortium in light of a worker's compensation lien. Section 5(b) of the Workers' Compensation Act provides that an employer who has compensated an employee has a right to reimbursement from any compensation the employee receives from a suit against a third party. (Ill. Rev. Stat. 1989, ch. 48, par. 138.5(b).) The court explained:

> "It is of utmost importance that the trial court protect an employer's lien. When a settlement agreement allocates an award between an employee's claim for personal injuries and a spouse's claim for loss of consortium, the trial court must closely scrutinize the agreement so that an employer's rights are not abused." (*Blagg*, 143 Ill. 2d at 195, 572 N.E.2d at 924.)

Even though there is no lien warranting protection in the instant case, the requirement of good faith in allocating a settlement is applicable here. However, because we are not dealing with an employer's lien, as in *Blagg*, the question becomes "what constitutes good faith in allocating the settlement and can parties act in good faith if they allocate settlement proceeds to reduce setoff?"

The Contribution Act contemplates settlement as a goal. (Ill. Rev. Stat. 1989, ch. 70, pars. 302, 303, 304.) This goal would be thwarted were we to adopt defendants' suggestion of interfering in the apportionment of settlements where a settlement is otherwise made in good faith.

> "[A] party refusing to settle a case on agreed terms *** always risks that he will be exposed to enhanced liability by that refusal. This is implicit in the very nature of a settlement: a party either compromises in return for the certainty of a fixed result, or gambles that he will obtain a more advantageous result by taking his case to trial, knowing that he risks losing by that gamble. ***
>
>             * * *
>
> *** [A]ppellant's argument would take from appellee and those in appellee's position the ability to settle their own cases, and would rather effectively place veto power over any settlement in the hands of the hardest bargainer ***. ***[I]t seems

contradictory to allow one litigant to hold the others hostage to its own intransigence." (*Doellman*, 147 Ill. App. 3d at 849-51, 498 N.E.2d at 696.)

Defendants refer to Justice Ryan's dissenting opinion in *Henry v. St. John's Hospital*:

> "Settlement agreements should not be used as an instrument of conspiracy to 'gang up on' a nonsettling defendant, thereby shifting a substantial part of the liability to one not a party to the agreement." (*Henry v. St. John's Hospital*, 138 Ill. 2d at 553, 563 N.E.2d at 419.)

As we have indicated earlier, however, there is more to consider than just the nonsettling defendant. Those parties opting to settle should have control over the settlement allocation in order to provide leverage as to the nonsettling parties. To hold otherwise would enable the recalcitrant defendant to dictate that a trial would ensue. This is not the goal of the Contribution Act.

█ Defendants' final argument is that because another policy of the Contribution Act is to equitably apportion damages (*Perez v. Espinoza* (1985), 137 Ill. App. 3d 762, 765, 484 N.E.2d 1232, 1235), we should set off the total settlement to preclude the plaintiffs from receiving a double recovery. Defendants' suggestion would require that we treat the plaintiffs in this case as a "family unit." No authority is cited for this theory, and we are not prepared to hold that the amounts awarded in settlement are to be combined for the purposes of setoff simply because the plaintiffs are a "family unit." Under the defendants' theory, multiple plaintiffs with any familial relationship would necessarily be treated as a single entity. We can visualize many situations when such treatment would not only be difficult to achieve, but would also be potentially inequitable. For example, if a family unit of a mother, father, and three children were injured in an automobile accident involving two defendants, the appellants would contend that the possibility of settlement manipulations would dictate that the total amount paid for all five claims by defendant one would have to be lumped together as a setoff to benefit defendant two. This bright-line rule would be easy to apply, but like most such rules its ease of application must be balanced against its need and its potential for inequitable results. If we were to adopt defendants' argument, plaintiffs who are not part of a family unit would not be required to set off their total recovery against the jury's verdict. To require a setoff of the entire settlement for family units while not requiring such for other types of plaintiffs is inconsistent. Trial courts have been given the discretion to evaluate the good-faith nature of settlements precisely be-

cause they are in the best position to make such decisions. As indicated earlier, we find no abuse in the trial court's decision in this case.

Defendants further contend that the two verdicts here are inseparable and are to be shared by each plaintiff. The parties have not cited any authority, and our research has uncovered none, which holds that a nonsettling defendant is permitted to use the total settlement as a setoff against the jury's verdict.

The judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

RARICK, P.J., and GOLDENHERSH, J., concur.